## Garden City Sand Company, et al., v. The Southern Fire Brick & Clay Company, et al.

### Gen. No. 12,221.

1. RESTRAINT OF TRADE—*when contract not in.* A contract by which one party agrees to manufacture and sell a particular product exclusively to another party, who agrees to take such product, is not in restraint of trade.

2. INJUNCTION—*lies to enforce negative covenants.* Equity will take jurisdiction to enforce by injunction the negative covenants of a contract.

Bill for injunction. Appeal from the Superior Court of Cook County; the Hon. MARCUS KAVANAGH, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1905. Reversed and remanded. Opinion filed February 20, 1906.

**Statement by the Court.** This is a proceeding in chancery in which appellants prayed for an injunction restraining the Southern Fire Brick and Clay Company, one of the appellees, from selling or delivering any fire clay mined on certain described lands in Vermillion County, Indiana, to any one except complainants at any time prior to September 10, 1909, and from manufacturing any fire clay from said lands into fire brick or any other fire clay product during said period; and restraining the defendant Dick N. Lanyon and others from selling, delivering or manufacturing into fire brick or any other product any fire clay mined in Indiana to or for anyone except complainants.

The foundation for the bill of complaint and amendments thereto is a certain contract made the 10th day of September, 1901, between Dick N. Lanyon of Chicago, called therein the first party, James A. Heber and Willis Bonebrake of Hillsdale, Illinois, called the second party, The Garden City Sand Company, an Illinois corporation, called the third party, Hillsdale Fire Brick & Clay Company, an Illinois corporation, called the fourth party, and J. B. and Mrs. Maria Warner of Indiana called the fifth party.

We deem it unnecessary to recite at length provisions of the contract, not directly relevant to the questions to be determined on this appeal. By the agreement the second party agree to mine, grind and to operate exclusively for Lanyon, the first party, a fire clay grinding plant located upon Lanyon's land at Jonesdale Switch, Vermillion county, Indiana, which land is described. Lanyon and the said second party agree to mine, grind, screen and load f. o. b. cars at said switch, first class marketable fire clay at 77½ cents per ton in such quantities and at such times as the third, fourth and fifth parties may order. Lanyon agrees to erect and equip the plant required for such purposes. He further agrees not to work, lease or operate any other fire clay grinding plant for the purpose of selling fire clay on any land that he now owns in Indiana, and he and the second party who were to operate the plant for him, agree not to sell fire clay to any

other persons or corporations other than the remaining parties to the contract during its life.

The remaining parties agree with Lanyon that when the new plant is ready they will cease to operate a plant at Russell Switch in the same county so long as the new plant at Jonesdale Switch is capable of doing its proper work, unless the clay there produced shall be unsatisfactory to former customers, in which event the plant at Russell Switch may be operated to furnish clay to such customers.

The third, fourth and fifth parties agree to buy no fire clay produced in Indiana except that from one or the other of the two plants mentioned; and they agree to make the greatest possible endeavor to sell all the fire clay produced by Lanyon. They agree, jointly but not severally, to order and pay " for not less than an average of forty tons of fire clay, such average to be based on a total of 1,040 tons per month or forty tons per day for twenty-six days, and agree to pay 77½ cents a ton therefor, provided however Lanyon and the second party shall produce and deliver f. o. b. cars at Jonesdale Switch not less than an average of forty tons of fire clay daily. They are to have the benefit of railroad rates, and covenant and agree that during the life of the contract " they will not enter into any combination or trust for the purpose of limiting the output or total production of fire clay by either of the aforesaid plants. The contract provides that it shall be fully operative as soon as the " first two parties are prepared to produce and deliver 20 tons of fire clay per day and continue eight years from the time when such producetion and delivery begins." The instrument was filed for record in the office of the Recorder of Vermillion county, Indiana, October 22d, 1901, and recorded on the 24th of the same month.

Lanyon began the erection of the fire clay mining and grinding plant on his land at Jonesdale Switch shortly before the final execution of the contract. It was understood the plant would be completed about November 1, 1901. It never was completed. The bill recites that September 17, 1902, defendant, The Southern Fire Brick and Clay Com-

pany, received through mesne conveyance from Lanyon dated April 15, 1902, a warranty deed to portions of the land described in the contract in question, which it acquired with full notice of said contract and its terms; that said company was subsequently notified that if necessary, legal steps would be taken to restrain it from operating a fire clay or fire brick plant and mining, selling or using fire clay upon or from said lands. On the 28th of May, 1902, complainants served notice on Lanyon, Heber and Bonebrake, first and second parties to said contract, that more than enough time to equip the plant on Lanyon's said land as provided in the contract, had elapsed, and demanded that the production, sale and delivery of fire clay to the extent of forty tons per day as the contract provided should at once begin.

The bill charges and it is not disputed that defendant The Southern Fire Brick Company has constructed on said lands included in the contract and which it obtained from Lanyon, a plant for mining and grinding fire clay and manufacturing fire clay brick and other fire clay products for sale on the open market; that complainants have offered to accept from the defendant company the forty tons of fire clay called for daily under the said contract and to pay therefor the contract price; that said defendant company has disregarded said notices and is engaged in removing, selling and disposing of fire clay from said lands for its own exclusive profit and has refused and still refuses to sell and deliver to complainants the forty tons per day to which they are entitled under said contract; that said defendant company is shipping great quantities of fire clay from said lands; and it is averred that long before September 10, 1909, all of said fire clay will have been removed from said land and be lost to complainant.

Complainants represent that they were the first to introduce and place on the market said fire clay, which was done under the name of Dome Fire Clay as a trade name, and that they had built up a large trade therein; that the defendant company has entered the market in direct competi-

tion with complainant, representing that it would sell at reduced prices the same clay as that sold by the complainant Garden City Sand Company under said name of Dome Fire Clay.

The defendant company admits most of the facts charged which are material to the controversy. It denies that complainants have or ever had any interest in or lien upon the lands in controversy and asserts that they have an adequate remedy at law. Amended and supplemental bills were filed. The foregoing statement sufficiently shows, we think, the nature of the questions involved. It appears that January 18, 1904, after the taking of testimony in the case had begun before the master, Lanyon notified complainants in writing that he had constructed on his land described in the contract a plant such as the contract called for, and was ready to enter upon and carry out his part of the contract of September 10, 1901, and awaited complainants' orders for such fire clay. The plant thus referred to was not that provided for in the contract, but one erected subsequently in a different location.

The cause was referred to a master who reported the evidence taken before him and his conclusions. In his first report he finds the action is brought to procure specific performance of the contract of September 10, 1901, and for an injunction to restrain the negative covenant of said contract; that such action will not lie; that the injunction prayed for would not obtain fire clay for complainants, but merely prevent defendants from selling the same elsewhere; and that it has not been shown complainants have not an adequate remedy at law.

Subsequently the bill was re-referred, and additional testimony taken. The master's supplemental report finds it not proven that since the opening of the mine and operation of the plant by the defendant company on the land covered by the contract of September 10, 1901, said company has reduced the amount of complainants' trade by reducing prices; that said contract by its terms was to go into effect as soon as Lanyon could produce twenty tons of fire clay per day from his plant to be erected on his said land, which con-

dition was fulfilled on or about March 1, 1904 (after the present litigation was in progress), prior to which time said contract had been purely executory and had never gone into effect actually or legally; that as soon as Lanyon was able to produce forty tons per day complainants failed to give him orders for such quantity per day, and have therefore violated the terms of said contract; that the preponderance of evidence shows that this Indiana clay possesses no qualities making it more desirable than Illinois or Kentucky clay. The master further finds that the contract of September 10, 1901, contemplated and provided for trade and commerce among the several states, was in the form of a trust in restraint of trade and that the sole object of complainants is not to obtain fire clay from the defendant Southern Brick and Clay Company under the contract of September 10, 1901, but to prevent the latter from entering the market in competition with complainants in the sale of said fire clay. He recommends a decree dismissing the bill for want of equity.

The Superior Court entered a decree dismissing the amended and supplemental bills in accordance with the master's recommendation.

EDWIN C. CRAWFORD and WILLIAM R. BURLEIGH, for appellants.

BEACH & BEACH, for appellee, Southern Fire Brick and Clay Company.

MR. JUSTICE FREEMAN delivered the opinion of the court.

The first question presented is whether the contract of September 10, 1901, is valid. The master finds that its manifest purpose and intent were to limit the production of fire clay regardless of the public market, that it was entered into by the complainants for the purpose of preventing the mining and manufacture of fire clay from any fire clay lands in the State of Indiana, and was therefore a contract in restraint of trade and commerce among the several states.

We find no support for this finding in the contract itself nor in the evidence. On its face the contract provides that Lanyon shall erect a fire clay grinding plant upon certain described lands of his own containing in the neighborhood of 160 acres, so far as appears the only land he owned in Indiana, to be operated in mining and producing fire clay to be sold to complainants at an agreed rate per ton, in such quantities and at such times as complainants shall order, and that he will increase the capacity of said plant as fast as the demands of the business require. He agrees not to work, lease or operate during the period of the contract any other fire clay grinding plant for the purpose of selling fire clay on any land he owns or controls in Indiana and that he will not during that period sell fire clay to anyone except complainants. The latter on their part agree that as soon as Lanyon gets his new plant in readiness they will cease to operate a plant from which they were then obtaining clay, unless such operation should be made necessary by increase of business beyond the capacity of Lanyon's new plant, and will buy no fire clay produced in Indiana except what is produced at one or the other of said plants; that they will endeavor to sell all the fire clay produced by Lanyon and will jointly order and pay for not less than 40 tons per day at the agreed price per ton, if Lanyon's plant is able to produce and deliver so much. There is in this so far as we can discover nothing in the nature of a contract in restraint of trade. It is in substance and effect an agreement by parties on one hand to give their whole time and effort exclusively to produce from a specified portion of land a supply of fire clay sufficient to fill the wants of other contracting parties and to increase capacity for such production as fast as the business demands. In return the second parties agree to buy fire clay from no one else in that locality, to " make the greatest possible endeavor to sell all the fire clay " that the first parties can produce, and to take and pay for at a fixed price not less than 40 tons per day in any event. If this is a contract in restraint of trade, the same objection would lie to a contract by a farmer to sell all the milk he could produce on

his farm to a single purchaser in consideration that the purchaser would take at least 40 cans per day and buy milk of no other producer, so long as the farmer could supply his needs. Appellees claim that the fact the land in question may have contained clay enough so that it could be made to produce more than 40 tons of fire clay per day during the term of the contract with a sufficient investment of capital, a sufficiently large plant and a sufficiently large number of men employed, makes the contract obnoxious to the federal statutes declaring illegal every combination in the form of trust or otherwise or conspiracy in restraint of trade or commerce among the several states. We discover no such elements in this contract.

Nor does the evidence sustain appellees' contention. It appears that the land described in the contract is within the area of a territory underlaid with a stratum of fire clay, extending about seven miles north and south and about a mile in width. It is said to be the only bed of the kind discovered in Indiana, but beds exist in other states, at Ottawa, Illinois, in Missouri, Ohio, Kentucky and Pennsylvania. Lanyon owned none of the land except what is described in the contract. Several plants were in operation upon other lands, overlying the same bed of clay worked by independent operators. Lanyon was not working the clay upon his land. The contract gave him a sure and steady market and seems to have been the inducement for him to go into the business. Nor did the contract limit production, except incidentally to the capacity of the plant and the demands of the business. The complainants agreed to use their best endeavor to sell all Lanyon could produce. In Whitwell v. Continental Tobacco Co., 125 Federal Rep., 454, the Federal anti-trust law of 1890, which appellant invokes, is considered and it is said that if the direct and necessary effect of a contract or combination upon competition in commerce among the states " is to stifle or to directly and substantially restrict free competition, it is a contract, combination or conspiracy in restraint of trade " (citing authorities). " If on the other hand, it promotes or but incidentally or indirectly re-

stricts competition, while its main purpose and chief effect are to foster the trade and to increase the business of those who make and operate it, then it is not a contract, combination or conspiracy in restraint of trade within the true interpretation of this act and it is not subject to its denunciation" (citing authorities). In the case at bar the contract, as the evidence tends to show, had no effect upon competition, nor so far as appears upon prices. Any competitor of either Lanyon or complainants could obtain all the fire clay he could sell or use from other plants operated on other lands in this same Indiana clay belt, as well as from other clay beds, provided he had the capital to invest in the business. The purpose and effect of the contract were clearly to " foster the trade and increase the business of those who made " it and nothing more. No one was or so far as appears could be injured by it. Whatever restraint of trade is involved is only such as to " afford a fair protection to the interests of the party to whom it is given, and not so large as to interfere with the interests of the public." Lord Macnaghten's judgment in Nordenfeldt v. Maxim Nordenfelt Co., cited in United States v. Addyston Pipe & Steel Co., 85 Fed. Rep., 271 p. 282. See also United States v. E. C. Knight Co., 156 U. S., 1, p. 17. The contract in controversy seems to be an ordinary business arrangement such as the parties had a right to make, violating no statute, either in letter or spirit and not against public policy.

It is urged by counsel for appellees that the bill is in reality one for specific performance of the contract. Such is not the prayer of the bill nor its direct purpose or object. An injunction is prayed restraining the defendant company, Lanyon and his agents, from mining or selling any of the fire clay claimed by appellants under the contract, except for and to appellants. Lanyon with Heber and Bonebrake who agreed to operate his plant for Lanyon expressly agreed not to sell to anyone other than complainants during the life of the contract. This is an express negative provision which has been and is being violated. The defendant company with full knowledge of the contract and its provisions and

with the evident purpose of robbing appellants of the benefit of the contract, induced Lanyon to enter into an arrangement as a result of which he ceased making an effort to comply on his part with his agreement and put it out of his power to do so. The defendant Southern Fire Brick and Clay Company located its plant on the same spot and is mining clay on the same land where under the contract Lanyon was to locate the plant, the product of which he agreed to sell to complainants. Within six months after the contract of September 10, 1901, Lanyon had the plant therein provided for almost completed. Then it was that the proposition was made to him in behalf of the defendant corporation which resulted in his transfer of the nearly completed plant for its benefit and the abandonment on his part of further performance of the contract. He never did finish the plant as called for by the contract, and put it out of his power to do so by his arrangement with appellees.

We perceive no equitable ground for denying appellants the relief by injunction prayed for in the bill. As said in Consolidated Coal Co. v. Schmisseur, 135 Ill., 371–378, " it seems to be well settled that where there is an express negative covenant, courts of equity will entertain bills for injunction to prevent " its breach even though the breach may occasion no substantial injury. The ground upon which the court proceeds is said to be in substance that a party having expressly stipulated that he will not do a particular thing is bound to refrain and the other party is not required to submit to the opinions of others as to whether he will or will not suffer substantial injury. This might result indirectly in bringing about substantially specific performance, though not necessarily. In the case last referred to (p. 377) it is said: " It might well be that a very important element of the value of the purchase of the Schuremans consisted in the right they thereby acquired of controlling the mine and holding the coal for future use." In the case at bar it may be that a very important element of the value of the contract to complainants consisted in the right to control and hold the clay for their own use. The jurisdiction of equity to inter-

fere by injunction is considered at length in Consolidated Coal Co. v. Schmisseur, *supra,* and authorities there cited. That case is, we think, decisive as to the propriety of an injunction in appellants' favor restraining violation of express negative provisions of the contract in controversy.

It is urged that such injunction would inflict serious loss on the defendant company. If so it is the result of its own misconduct. It had full knowledge of the contract and deliberately proceeded to usurp rights secured by said contract to complainants, with notice that if it did so complainants would invoke the aid of the courts for their own protection. Its acquisition of the fee in the lands was subject to the contract right of complainants in the clay. See Knight v. The Indiana Coal & Iron Co., 47 Ind., 105–110.

The decree of the Superior Court is reversed and the cause remanded to that court for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*