THE GARDEN CITY SAND COMPANY *et al.* Plaintiffs in Error, *vs.* THE SOUTHERN FIRE BRICK AND CLAY COMPANY *et al.* Defendants in Error.

*Opinion filed October 28, 1913—Rehearing denied Dec. 4, 1913.*

1. INJUNCTION—*a party may be liable for damages in equity though not at law.* The fact that a defendant to a suit to enjoin it from doing certain acts in violation of the complainant's contract rights is not a party to the contract, and could not, therefore, be liable in an action at law for damages resulting from the violation of the contract, does not necessarily relieve it from liability for damages in equity.

2. SAME—*when defendant to injunction suit is liable for damages.* A fire clay company which, with full, actual knowledge of the facts, purchases land in which another company has the exclusive right to the clay under a contract with the owner, and which, after service of process in a suit to enjoin it from removing or selling the clay, continues to remove and sell it until the end of the litigation, which terminated in an injunction against such acts, is liable in damages, where its acts pending the result of the suit have rendered the injunction ineffective as a remedy for the wrong to the complainant.

3. DAMAGES—*when damages for the loss of profits cannot be recovered.* Where a fire clay company purchases land with full knowledge that another company has the exclusive contract right to the fire clay therein, and, after service of process in an injunction suit, continues to remove and sell the clay until an injunction was granted, several years later, during which time it had removed and sold over fifty thousand tons of the clay, it is liable to the other company for the difference between the contract price

and the fair average market price of the clay so removed and sold, but·it is not liable for loss of profits to the other company due to cutting prices and other lawful business methods, there being no claim that the land wrongfully worked was the only clay land available. (*Landis* v. *Wolf,* 206 Ill. 392, explained.)

WRIT OF ERROR to the Branch "C" Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. GEORGE A. DU-PUY, Judge, presiding.

EDWIN C. CRAWFORD, WILLIAM R. BURLEIGH, and FREDERICK W. PRINGLE, for plaintiffs in error.

BEACH & BEACH, for defendant in error the Southern Fire Brick and Clay Company.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiffs in error (hereafter referred to as complainants) filed their bill in chancery in the superior court of Cook county praying an injunction restraining the Southern Fire Brick and Clay Company, its officers, agents and employees, from selling or delivering any fire clay mined on lands described ·in the bill, located in Vermilion county, Indiana, except to complainants, at any time prior to September 10, 1909, and restraining said Southern Fire Brick and Clay Company from manufacturing any fire clay from said lands into fire brick or any other fire clay product during said period. The bill also prayed that Dick N. Lanyon, James A. Heber and Willis S. Bonebrake be restrained by writ of injunction from selling, using, delivering or manufacturing into fire brick, or any other product, any fire clay mined in the State of Indiana, to or for anyone except complainants, at any time prior to September 10, 1909. The bill also prayed that defendants be decreed to account to the complainants for fire clay that had been, or might after filing the bill be, taken out of the lands mentioned, and for

general relief. The superior court dismissed the bill for want of equity. Complainants appealed from that decree to the Appellate Court for the First District. That court held complainants were entitled to the injunction prayed for in the bill and reversed the decree and remanded the cause to the superior court, with directions to enter a decree for an injunction as prayed. (*Southern Fire Brick and Clay Co.* v. *Garden City Sand Co.* 124 Ill. App. 599.) An appeal was prosecuted by the defendants, or some of them, from the judgment of the Appellate Court to this court, where the judgment of the Appellate Court was affirmed. (*Southern Fire Brick and Clay Co.* v. *Garden City Sand Co.* 223 Ill. 616.) Complainants' right to the fire clay, brick and other products manufactured therefrom, and to the relief prayed in the bill, was based upon a contract entered into between them and Lanyon, the owner of the land and fire clay, and Heber & Bonebrake, who were to operate a plant to be erected by Lanyon on the land for the mining and grinding of fire clay. The contract between the parties is set out, in substance, in the opinions of the Appellate Court and this court above referred to. It was to continue in force eight years after the date of its execution, October 26, 1901, and during that period Lanyon agreed not to work, lease or operate any other fire clay plant on any lands he owned or was interested in in the State of Indiana, and he agreed not to sell fire clay to any other persons than complainants during the life of the contract. Complainants agreed to buy no fire clay produced in Indiana except that produced under the contract, and agreed to take and pay for a minimum of 1040 tons of fire clay per month at 77½ cents per ton, and to make the greatest possible effort to sell all the fire clay produced under the contract. In September, 1902, the Southern Fire Brick and Clay Company, with both actual and constructive knowledge of the contract between complainants and Lanyon and He-

ber & Bonebrake, bought about ninety-three acres of the land from Lanyon covered by the contract, and at once erected a large plant for the mining, grinding and manufacturing of fire clay upon said land, and in March, 1903, began to put its product on the market. The injunction was sought to prevent the continuance of the work. The relief prayed was resisted upon the ground that the contract was in unlawful restraint of trade and therefore invalid, also that complainants had an adequate remedy at law. These defenses were not sustained by this court and the Appellate Court. The contract was held to be a valid contract and not in unlawful restraint of trade, and it was held that complainants were entitled to the writ of injunction. Upon the case being re-instated in the superior court a decree was entered January 3, 1907, vacating the former order and decree and ordering a writ of injunction to issue against defendants, substantially as prayed for in the bill. On the 5th of March, 1907, the chancellor sustained exceptions to supplemental answers of the Southern Fire Brick and Clay Company and Lanyon, filed September 31, 1906, and entered a decree that the defendants account to complainants for all the fire clay they, or either of them, had taken from the lands described in the bill since the date it was filed, April 4, 1903, or which they might thereafter take. The cause was ordered referred to a master in chancery for the purpose of ascertaining the amount of fire clay, if any, that had been so taken, and in what amount, if any, complainants had been damaged or injured by reason of the taking of clay from the premises. The case was pending before the master nearly three and one-half years, during which time a vast amount of evidence was heard by him. In a lengthy and exhaustive report reviewing the testimony the master found complainants had sustained damages to the extent of $56,557.98, and recommended that a decree be entered therefor. Exceptions of defendants were sustained to the report on the ground that complainants were not en-

titled to damages, and a decree was entered to that effect. On appeal by complainants to the Appellate Court for the First District the decree of the superior court was affirmed, and upon the petition of complainants for writ of *certiorari* the record is brought to this court for review.

A brief statement of some of the important facts will aid in a better understanding of the situation.

The fire clay accessible to the markets of Chicago and its vicinity is found in Vermilion county, Indiana, and at Utica and Ottawa, in LaSalle county, Illinois. Freight rates for transportation of the clay and its products form a considerable part of the cost to the consumer. The rates from the plants in Illinois and Indiana to Chicago were about the same, so that plants in both places could compete with each other in the Chicago market and had an advantage in freight rates in that market over plants located in other States at more distant points. For points in the territory supplied from the plants in Illinois and Indiana, the plants nearest the consumer, because of the reduced freight rates, practically controlled the market for their product in that immediate vicinity. Complainant the Hillsdale Fire Brick and Clay Company was a producing company organized in 1900 for the mining, grinding and manufacturing of fire clay in Vermilion county, Indiana. Complainants J. B. and Maria Warner owned one-half the stock in that corporation, and complainant the Garden City Sand Company, a selling company, owned the other half. The entire product of the Hillsdale Fire Brick and Clay Company was sold to the Warners and the Garden City Sand Company. The territory was divided between them until 1902, when the Warners turned the whole territory over to the Garden City Sand Company under an agreement whereby the Warners were to be paid a commission upon all sales in the territory which had formerly been theirs. After purchasing the land from Lanyon the Southern Fire Brick and Clay Company erected a plant at a cost of about $250,000,

with about three times the capacity of the Hillsdale company or the Utica and Ottawa plants. The master found that up to the time the Southern Fire Brick and Clay Company began business the demand for fire brick and clay produced by the Hillsdale company had been sufficient to keep the complainants' plants running to practically their full capacity at profitable prices; that within a few months after the plant of the Southern company was started that company began to cut prices, quote the same to customers of complainants, and thereupon the business of complainants decreased greatly.

The only brief filed in this court on the part of the defendants in error is the brief of the Southern Fire Brick and Clay Company, referred to hereafter as the Southern company. This company makes these two principal contentions: (1) That it is not liable for any damages whatever; and (2) that the measure of damages adopted by the master in chancery, if there is any liability, is not the correct rule for the assessment of damages. It is also contended that the superior court failed to continue the cause for further proceedings after entering the decree for injunction in January, 1907, and thereby lost jurisdiction to enter the decree of March, 1907, referring the cause to the master to take proof as to the damages sustained and report his conclusions thereon. We are of the opinion this contention is without merit.

It is contended by the Southern company that as it was not a party to the Lanyon contract it cannot be held liable for damages, either at law or in equity, and that the only relief complainants were entitled to was the injunction restraining the defendants from removing the fire clay. It is claimed this is the effect of the former decision of this court in this case. This is a misapprehension. In its former decision this court held that the contract between Lanyon and complainants in the bill was not in illegal restraint of trade and was a valid contract; that the Southern company, al-

though not a party to the contract, with full knowledge of it bought the land from Lanyon and was committing the acts complained of in the bill, and it was held that complainants were entitled to the writ of injunction. In discussing the contention that the bill was properly dismissed in the lower court because complainants had an adequate remedy at law, the court said, the Southern company not being a party to the contract, complainants could not maintain an action at law against it for the damages sustained. Under these circumstances it was held a court of equity had jurisdiction to enjoin the acts and threatened acts of the Southern company. Lanyon himself being insolvent, complainants had no adequate remedy at law against him. It was never held that the Southern company was not liable in any form of action for damage caused complainants by its wrongful acts, but that it was not liable in an action at law on the contract because it was not a party to the contract and no contractual relation therefore existed between it and complainants. The grounds upon which the complainants were entitled to an injunction were, that by the acts of the Southern company, and its threatened continuation of such acts, they had suffered, and would suffer, injury and damage. No temporary writ of injunction was issued upon the filing of the bill and the Southern company continued its wrongful acts. It would be strange that, notwithstanding these wrongful acts were so damaging to the complainants as to entitle them to the writ of injunction, the Southern company would be exempt from any liability for their commission. If the remedy in such cases as this is by injunction, only, it would often be so inadequate as to amount to no remedy. After the bill was filed and process served the Southern company continued to disregard and violate the rights of complainants and damage them, until, pursuant to the mandate of this court, the injunction was issued, nearly four years after suit was begun. By that time the remedy by injunction was of no benefit, as the

injury and damage which it was sought to prevent by the writ had been completed and the Southern company had ceased operating on the Lanyon land. The bill was primarily for an injunction, and the assessment of damages was incidental to that relief. When the case was formerly before this court it was held that complainants' right to the writ of injunction was based upon their right to enforce negative covenants in the contract. It is true, the Southern company was not a party to that contract, but it had full, actual knowledge of its terms before it bought the land, and its liability for damages caused under such circumstances is not dependent upon any legal or contractual liability, but the remedy is an equitable one and incidental to the injunction, which could afford only partial relief. Story, in his Equity Jurisprudence, (12th ed. sec. 794,) says it is principally, but not exclusively, in cases of specific performance that the question of awarding compensation and damages arises; and in section 799, that the jurisdiction to assess damages or compensation in equity is ancillary to some other relief prayed, as in cases of fraud, or in cases where the party has disabled himself, *ex post facto,* from performance. It is said in section 236 of Pomeroy's Equity Jurisprudence: "It may be stated as a general proposition, that wherever a court of equity has jurisdiction to grant the remedy of injunction for some special purpose, even though the injunction covers only a portion of the controversy, it may go on and decide all the issues and make a final decree granting full relief."

*People* v. *City of Chicago,* 53 Ill. 424, is strong support for the principle announced by the text writers above mentioned. The law required the proceedings, notices and ordinances of the city to be published in the newspaper printed in the German language having the largest daily circulation. The council designated a certain newspaper for that purpose. The proprietors of another newspaper claimed to be entitled to the printing under the law, and filed a bill for an

injunction against the city authorities and the newspaper designated by the council, and for general relief in the premises. The court said: "While there may be grave doubts whether a court of chancery would take jurisdiction for the mere purpose of compelling the proper execution of the law in question on the part of the common council, yet having acquired jurisdiction for a purpose clearly within the province of a court of chancery,—that of awarding an injunction,—it may retain the bill for the purpose of ascertaining and enforcing all the rights of the parties properly involved in the subject matter in controversy."

While, as said by Judge Story, the principle is applied most frequently in cases of specific performance, it is by no means confined to that class of cases nor to cases where contractual relations of some character existed between the parties. In *Lewis* v. *Town of North Kingston,* 16 R. I. 15, (27 Am. St. Rep. 724,) complainants filed a bill to enjoin the town of North Kingston from tearing down and removing a building alleged to be in the possession of and belonging to complainants. Defendant answered, denying complainants owned the lot the building was on and averred it was a part of a public highway. Subsequently the defendant, by supplementary answer, alleged it had carried out its purpose of removing the building and foundations and grading down the lot, and averred the complainants ought not to have the relief prayed for in their bill because they had an adequate remedy at law. Under this state of the pleadings defendant moved that the bill be dismissed. The court held the case was one authorizing the writ of injunction, and said: "It ought not to be in the power of a defendant in an injunction bill to oust the court of its jurisdiction by committing, *pendente lite,* the very acts to prevent which the suit was begun, and such we think is the law." The court then quotes from *Milkman* v. *Ordway,* 106 Mass. 232, where it was held that there was little or no conflict of authority upon the proposition that when a

defendant to a bill in equity disenables himself, pending the suit, to comply with an order for specific relief, the court will afford relief by way of compelling compensation and for that purpose will retain the bill. The opinion then concludes: "It may be that an amendment of the bill setting forth the acts committed by defendant *pendente lite* will be necessary, notwithstanding the supplemental answer, if the complainants desire not only an injunction from further interference but also an award of damages, but if so, the complainants should have an opportunity to make it." The motion to dismiss was denied.

In *Westphal* v. *City of New York,* 69 N. E. Rep. 369, (court of appeals,) the city established driven wells and pumping stations. Plaintiff, as owner of farm lands within the city limits, brought suit for an injunction, alleging that the wells and pumping stations affected the natural flow of underground waters and absorbed them to such an extent as to cause irreparable injury to the plaintiff's lands. The bill prayed an injunction and the assessment of damages for the injuries already suffered and an additional sum for permanent damages. A decree was rendered assessing the damages up to the time of the trial and finding the amount of the permanent damages to the lands. It was adjudged that the city pay the past damages and that it should be enjoined unless it paid the amount of the permanent damages. In that event it was decreed that plaintiff should execute a release to the defendant of the right to maintain its wells and pumping stations. This decree was affirmed by the court of appeals.

*Jackson* v. *Stevenson,* (Mass.) 31 N. E. Rep. 691, was a bill to enjoin the erection of a building in violation of restrictions in the deed conveying the property. Complainants and defendants acquired title under deeds from the same grantor, containing the same restrictions. The court held that on account of changed conditions and uses to which the property was put complainants were not entitled

to the writ, but as they were by the report of the master entitled to damages the case should be retained for the assessment of damages, and it was ordered referred for that purpose.

In *Hazen* v. *Lyndonville Nat. Bank,* 70 Vt. 543, (67 Am. St. Rep. 680,) defendants, by their acts committed after service of process in an injunction suit, so changed the subject of the controversy that an injunction would not afford relief to complainants. The court said: "The purpose of the orators' bill was to enable them to secure the stock in question for the benefit of the creditors of H. E. Folsom, and this purpose would have been accomplished had an injunction such as they were entitled to have on the facts found, been granted them as of the date of the service of process in this suit upon the defendants. By reason of the acts of the defendants committed since the service of process upon them an injunction would now furnish them no relief. Whenever a court of equity has jurisdiction to entertain a bill for an injunction against the commission or continuance of a wrongful act, it may award damages in substitution for such injunction when the defendant, by his acts committed subsequent to the service of process upon him, has rendered relief by injunction ineffectual."

In *Foss* v. *Roby,* (Mass.) 81 N. E. Rep. 199, Foss and Roby were partners in the practice of dentistry in Boston. Upon a dissolution of the partnership Roby sold Foss his interest in the office furniture and equipment, together with the good will of the business. Foss formed another partnership and sold his new partner a one-half interest in the personal property and good will. Subsequently Roby began the practice of dentistry in Boston and by solicitation secured many patients of the old firm. Foss and his partner brought suit for an injunction. It was held that they were entitled to the writ, and, if they asked it, "such money damages as they may have sustained from this breach of the contract may also be assessed."

In *Lynch* v. *Metropolitan Elevated Railway Co.* 29 N. E. Rep. 315, (New York court of appeals,) a decree was sustained granting the relief asked in a bill to restrain the maintenance and operation of defendant's road in front of plaintiff's premises, and also praying for the assessment of damages which had already been sustained by plaintiff.

In our opinion defendants to the bill were liable to complainants for damages caused by their wrongful acts, and the court had jurisdiction, under the bill, to ascertain and assess the amount of such damages and thereby settle all of the rights of the parties involved in the subject matter of the controversy.

The master adopted the year 1902 as the standard for determining the profits made by complainants in the conduct of their business prior to the Southern company entering the field, in 1903, and found that prior to 1903 they were making yearly profits of $14,727.88. Their profits for the entire four years from 1903 to 1906, inclusive, he found to be only $5272.07. He found the increased expense of operation for these four years was $9569.11. This sum plus the profits made during that period amount to $14,841.18, which, deducted from the sum of four years' profits at $14,727.88 per year, leaves $44,070.34. This amount the master found to be the net loss of profits for the four years, for which the defendants to the bill were liable. In addition to that amount the master found defendants to the bill were liable to complainants for the difference between 77½ cents per ton for the clay mined and marketed by the Southern company from the Lanyon land, and one dollar per ton, which the evidence showed was the fair average sale price of the clay during that period. The damages on this account amount to $12,487.72, making the total damages for which the master reported the complainants were entitled to a decree, $56,558.06.

In our view of the law, under the facts in this case the loss of profits was not a proper element of damages to

be assessed and awarded complainants. Conceding the testimony supported the master's finding that a decrease in the profits of complainants' business began at once upon the Southern company beginning business on the Lanyon land, leaving out of consideration the increased cost of operation for these years, and that for the four years succeeding complainants made only a total profit of $5272.07 as against $14,727.88 they had been making annually before the Southern company began business, can it be said that this loss of probable profits was the result of the Southern company appropriating the clay complainants had contracted for with Lanyon? Were the purchase of the clay by the Southern company from Lanyon and the establishment and operation of its plant on the Lanyon land the proximate cause of complainants' alleged loss of profits? The Lanyon land was but a small part of the land in Vermilion county, Indiana, underlaid with fire clay of the same quality and which could be mined and put on the cars at no greater expense than Lanyon's. In 1906 the Southern company leased other lands immediately adjoining Lanyon's land for the purpose of mining and manufacturing clay therefrom and in September of that year ceased operating on the Lanyon land. It would have had the right to have done that instead of buying and working the Lanyon land and to have made such prices for its product as it saw fit, and in that case, notwithstanding the result might have been the destruction of complainants' profits, it would have afforded them no cause of action against the Southern company. Before the Southern company bought the Lanyon land complainants were mining clay on other land. The Southern company's entrance into the business on the Lanyon land did not take from complainants any clay they had, or any means and facilities for mining and marketing clay, prior to 1903. They still had the clay-producing plants and sales agents, which they continued to operate and use. They had a lawful monopoly of the Lanyon land described in the contract,

with the right to enjoin the Southern company from mining and selling the clay therefrom, but they had no right to interfere with the Southern or any other company in mining and selling clay and its products from other land in the vicinity. With the exception of the land described in the contract all other land in the vicinity, so far as complainants were concerned, was open for anyone who desired to engage in the business. It was unlawful for the Southern company to enter upon and take the clay complainants were entitled to under the Lanyon contract, but in our view that unlawful act cannot be said to have caused the loss of profits to complainants' business, for, as we have said, it took from them no clay, or means of mining, manufacturing and selling it, they had before. It prevented them from getting other clay they had contracted for but which had not belonged to them or entered into their business while they were making upwards of $14,000 per year in profits. From these considerations it seems apparent that complainants' being prevented from getting the clay contracted for was not the cause of the loss in profits, but the loss was the result of the Southern company selling its products at reduced prices. We can only speculate as to what would have been the result to complainants' business if the Southern company had not cut prices but had sold at the same prices complainants had established, but there is nothing in this record that would warrant the conclusion that the result would have been the same to the business of the complainants.

In our opinion, under the facts in this case the only damage complainants are entitled to is the damage resulting to them from their being prevented from making the profit they would have made on the clay if they had been permitted to mine and sell it. The Southern company is liable for that damage because its act in taking the clay which rightfully belonged to the complainants caused the damage, but loss of profits to business resulting from com-

petition and cutting prices by the Southern company,—a thing it or any other company had a right to do in mining and marketing clay and its products,—is not recoverable. If the Southern company had, when the bill was filed, moved its plant on the adjoining land which it leased in 1906, and conducted its business in the same method it did upon the Lanyon land, we see no reason for supposing that the effect upon the complainants' business would not have been the same.

Complainants attempt to sustain their right to recover loss of profits under the rule announced in *Landis* v. *Wolf,* 206 Ill. 392, and previous decisions announcing the same rule, but we do not think those cases, nor any others to which our attention has been called, support the right to recover, under the facts in this case, for loss of profits. The rule announced in *Landis* v. *Wolf, supra,* is only applicable where the complainant has been wrongfully prevented from transacting or carrying on his business. In that case a store was wrongfully closed by a writ of injunction, which, during its continuance, caused an entire suspension of the owner's business, and in an action on the injunction bond it was held that a loss of profits might be recovered, and for the purpose of showing such loss a reasonable period next preceding the time the business was wrongfully suspended might be taken as a standard for determining the profits that would have accrued to the owner if the business had not been interrupted, leaving the other party to show, if he could, that by depression in business or other causes the profits would have been less. It seems apparent that rule is not applicable to cases of this character. It does not appear from the evidence that complainants were dependent upon the clay from the Lanyon land to keep their business going, or that they were unable to procure just as much clay after the Southern company began business as they were before. The loss to complainants' business was not caused by their inability to get clay

but by their inability to get a profitable market for it, and this inability was the result of the Southern company's entering the field and reducing prices.

It is our conclusion that complainants were entitled to recover nothing on account of loss of profits, but that they were entitled to recover the difference between the price they agreed to pay for the clay, 77½ cents per ton for 55,501 tons,—that being the amount the proof shows was mined from the Lanyon land by the Southern company,—and one dollar per ton, the fair average sale price of the clay, making a total damage complainants were entitled to recover of $12,487.72.

The judgment of the Appellate Court and the decree of the superior court are reversed and the cause is remanded, with directions to the superior court to enter a decree in complainants' favor, against the defendants, for $12,487.72.

*Reversed and remanded, with directions.*