(No. 21365.—)

The Decatur Lumber and Manufacturing Company vs. Ed S. Crail, et al. Defendants in Error.—(The Corn Belt Building and Loan Association, Plaintiff in Error.)

*Opinion filed October 22, 1932—Rehearing denied Dec. 8, 1932.*

COTTON & NICHOLS, for plaintiff in error.

WEBBER & WEBBER, for defendants in error.

Mr. CHIEF JUSTICE HEARD delivered the opinion of the court:

This cause is here on *certiorari* to the Appellate Court for the Third District. The only question involved is that of priority between a mortgage of plaintiff in error, the Corn Belt Building and Loan Association, on real estate of Ed S. Crail and a mechanic's lien of Marion S. Clesson on the same property.

In June, 1929, Crail was the owner of the real estate. It was subject to a mortgage of $6000 held by the Corn Belt Building and Loan Association. Crail decided to remodel the house located on the premises and entered into a written contract with H. Logan & Son, of Decatur, to remodel it. The contract with Logan & Son covered everything connected with the remodeling job except the heating plant, as to which there was a separate contract between Crail and Clesson. In the course of the work Logan & Son purchased building materials from various parties in Decatur to use on the Crail job, and certain of these parties

filed mechanics' liens against the Crail property, but all of these items have been paid or otherwise settled. In order to finance the transaction, Crail, through the agency of a loan broker of Decatur, made an application to the Corn Belt Building and Loan Association of Tuscola for a loan of $10,500. This represented an increase over his old loan of $4500. Subsequently it developed that this amount would not be sufficient to pay the bills on the remodeling job, so the application was increased to $12,500, and the Corn Belt Building and Loan Association agreed to make a new loan on the property in question for $12,500. After the building was completed a meeting was held in the office of the Corn Belt Building and Loan Association at Tuscola, at which meeting there were present, Earl Logan, of Logan & Son, contractors on the job, Fred J. Pierce, the loan broker, Mr. and Mrs. Crail, and certain officers of the Corn Belt Building and Loan Association. At this meeting Logan and Crail signed affidavits setting forth the names of all persons who had unpaid bills for material and labor furnished on the Crail job, together with the amount due each person. Checks of the Corn Belt Building and Loan Association were then prepared for the various bills as the same appeared in the contractor's affidavit, among which checks was a check to Clesson for $1344.50. However, it developed that the $12,500 loan, after allowing for the $6000 necessary to take up the old mortgage, was insufficient to pay all of the claims specified, three claims being left over, namely, those of the Decatur Lumber and Manufacturing Company and the Morehouse & Wells Company, both of which have been settled and are not involved in this proceeding, and a claim of Clesson in the sum of $1578, which is the claim in controversy in this case. This item represented a claim for the heating plant, which was a separate contract between Clesson and Crail and was not included in the general contract with Logan & Son. At the same meeting a lien waiver was prepared by Clyde J. Col-

well, assistant secretary of the Corn Belt Building and Loan Association, which lien waiver contained the names of the various parties (including Clesson) having claims against the Crail property as set forth in the contractor's affidavit, together with the amount due each. This lien waiver was signed by the lienors, including Clesson, and the checks of the Corn Belt Building and Loan Association payable to the various parties named in the lien waiver were all turned over to Pierce, the loan broker, along with the new mortgage for $12,500, a release of the old $6000 mortgage, and the abstract. A separate lien waiver was prepared at the meeting for the Clesson heating plant. This lien waiver was turned over to Crail, who undertook to obtain Clesson's signature thereto, stating that he had an agreement to trade Clesson a lot in Decatur on the deal. The lien waiver contained the following language: "Each of the undersigned lien creditors of Ed S. Crail against the property described as [real estate in question], in consideration of the payment to him of the amount entered below opposite his printed name, does by his signature hereunder acknowledge said payment and releases all right to run a mechanic's lien or other claim against said premises to take prior right to the mortgage lien of the Corn Belt Building and Loan Association of Tuscola, Illinois, through its mortgage under date of December 2, 1929." The day after the meeting in Tuscola Pierce proceeded to record the papers and was then ready to pay out the checks. The following day Crail's wife brought Pierce a check payable to the order of Clesson for $1578, the amount of the heating plant claim, drawn by the Plymouth Casualty Insurance Company, of which Crail was an officer. This check was delivered by Pierce to Clesson, who accepted the same. Pierce paid out the checks to the various materialmen and contractors mentioned in the lien waiver. The amount thus distributed out of the loan fund amounted to $5469.74, of which sum $1344.50 was paid to Clesson. It included all of the items listed in

the lien waiver except the two items to the Morehouse & Wells Company and the Decatur Lumber and Manufacturing Company, which were settled afterwards. Pierce also turned over to Clesson the check of the Plymouth Casualty Insurance Company, which had been furnished him by Crail, for the sum of $1578 to pay the bill for the heating plant, and Clesson receipted the bill but did not sign a lien waiver for the amount of that bill. After all of these checks were distributed there remained in the loan fund the sum of $1209.51, which Pierce turned over to Crail in the check of the Corn Belt Building and Loan Association. Subsequently the Plymouth Casualty Insurance Company check for $1578 from Crail to Clesson was dishonored, and thereupon Clesson filed a claim for mechanic's lien. Both the circuit court and the Appellate Court allowed Clesson priority over the Corn Belt Building and Loan Association mortgage.

It is claimed by plaintiff in error that by reason of the execution of the waiver of lien by Clesson he is debarred from the right to a lien prior to that of plaintiff in error. This depends upon the construction to be given to the waiver. While it is the general rule that in construing a contract it is proper for the court to take into consideration the surrounding circumstances, this does not give the court the right, by construction, to establish a different contract from that expressed in the written agreement. If a written contract purports on its face to be a complete expression of the whole agreement, it is to be presumed that the parties introduced into it every material item and term, and in construing it the court will not add thereto another term about which the agreement is silent. (*Sterling-Midland Coal Co.* v. *Coal Co.* 334 Ill. 281; *Armstrong Paint Works* v. *Can Co.* 301 id. 102.) No words can be added to or taken from an instrument and thereby change the plain meaning of the parties as expressed therein. (*Stevens* v. *Felman,* 338 Ill. 391.) The object of construction is to

ascertain the intention which the parties have expressed in the language of the contract, and, where there is no ambiguity in the terms used, the instrument itself is the only criterion of the intention of the parties. (*Green* v. *Ashland State Bank,* 346 Ill. 174.) Mechanics' liens were not recognized by the common law nor allowed in equity independently of statutes but they exist only by virtue of statutes creating them and providing a method for their enforcement, and such statutes must be strictly construed with reference to all requirements upon which the right to a lien depends. While a waiver of lien for a clearly expressed special purpose will be confined by the courts to the purpose intended, yet where a general waiver is executed and there is nothing in the context to show a contrary intention there is nothing left for the court to do but enforce the contract as the parties have made it. (*Turnes* v. *Brenckle,* 249 Ill. 394.) The waiver executed by Clesson was a general waiver and clearly stated that for a valuable consideration he released all his right to a mechanic's lien or other claim against the premises "to take prior right to the mortgage lien of the Corn Belt Building and Loan Association."

When Clesson signed his lien waiver and received the check of the Corn Belt Building and Loan Association for $1344.50 and a check of the Plymouth Casualty Insurance Company for $1578 to pay the bill for the heating plant, and receipted the bill, he knew of the existence of the mortgage of December 2, 1929, knew that the mortgage was given for the purpose of paying off the claims for liens upon the mortgaged premises, and knew the proceeds of the loan were not sufficient without the Plymouth Casualty Insurance Company check to pay off all the indebtedness. He likewise knew that the aggregate of the Plymouth Casualty Insurance Company check and the proceeds of the loan were more than sufficient to pay the liens and would leave a surplus of about $1200 to be paid over to Crail. Acting upon the general waiver and Clesson's acceptance

of the check of the Plymouth Casualty Insurance Company in payment of the bill for the heating plant and Clesson's receipt of the bill, Pierce paid the balance of $1209.51 of the Corn Belt Building and Loan Association money to Crail. It is a fundamental doctrine in equity that where one of two innocent persons must suffer by the fraud of a third person, the loss must fall upon him who by his conduct put it in the power of such third person to cause the injury. (*Bartlett* v. *First Nat. Bank,* 247 Ill. 490; *Yeck* v. *Crum,* 122 id. 267.) The Corn Belt Building and Loan Association having been induced to act in the payment of its money by Clesson's execution of his general waiver and his acceptance of the Plymouth Casualty Insurance Company check, and his receipt in full for the heating plant claim, and the Corn Belt Building and Loan Association having thus changed its position for the worse in reliance upon Clesson's acts, it would be inequitable to allow Clesson to repudiate such acts and give him a lien on the premises prior to that of the Corn Belt Building and Loan Association, and the circuit court and the Appellate Court erred in allowing him such priority.

The Appellate Court properly held that M. W. Iles did not have a lien on the premises prior to that of plaintiff in error.

The judgment of the Appellate Court and the decree of the circuit court are reversed and the cause remanded to the circuit court, with directions to enter a decree adjudging plaintiff in error to have a first lien, under its mortgage, on the premises.

<em>Reversed and remanded, with directions.</em>