Industrial Natural Gas Company, First National Bank of Philadelphia, Trustee and Alexander B. Bassett et al., Appellees, v. Sunflower Natural Gasoline Company et al., Appellants.

Term No. 46F9.

Opinion filed January 20, 1947.
Released for publication February 20, 1947.

BROWN, FOX & BLUMBERG, of Chicago, BROWN, HAY & STEPHENS, of Springfield, and JOHN L. KAGY, of Salem, for appellants; CHARLES LEROY BROWN, of Chicago, ROBERT A. STEPHENS, JR., of Springfield, and DAVID F. MATCHETT, JR., of Chicago, of counsel.

FRANK R. HURLBUTT, of New York, WHAM & WHAM, of Centralia, and RAYMOND O. HORN, of Salem, for appellees; FRANK R. HURLBUTT, of New York, and CHARLES WHAM, of Centralia, of counsel.

MR. JUSTICE BARTLEY delivered the opinion of the court.

This is an appeal by the defendants, Sunflower Natural Gasoline Company, Sunflower Gasoline Corporation and Sunflower Petroleum Products Corporation, hereinafter called the defendants (whenever this opinion refers to defendant or defendants, it is meant to refer to the defendant or defendants to which the circumstances may apply), from that portion of a decree of the circuit court of Marion county which awarded damages to the plaintiff appellee, Industrial Natural Gas Company, hereinafter referred to as plaintiff, in the sum of $200,000, for a breach of contract of July 21, 1942 providing for the sale by the defendants to the plaintiff of natural gas. The appellees, First National Bank of Philadelphia, et al. were intervening plaintiffs and anywhere in this opinion that it may be necessary to refer to them, they will be particularly identified.

A complaint was filed March 14, 1944 and alleged, among other things, that by a certain agreement dated July 21, 1942 between the plaintiff and two of the defendants, Sunflower Natural Gasoline Company and Sunflower Gasoline Corporation, plaintiff agreed to buy and the defendants agreed to sell certain quantities of natural gas; that subsequent to the execution

of said agreement, the defendant, Sunflower Petroleum Products Corporation, by merger, consolidation or otherwise, acquired all of the assets of defendants, Sunflower Natural Gasoline Company and Sunflower Gasoline Corporation, and assumed their obligations including the said agreement of July 21, 1942; that the plaintiff was engaged in the business of buying natural gas and distributing and selling same to industrial consumers; that said agreement of July 21, 1942 is the only agreement which plaintiff had, or at any time has had, for the purchase of natural gas and constitutes the sole source of supply of natural gas available to plaintiff for delivery and sale by plaintiff to its customers; that the plaintiff entered into business in reliance on said agreement of July 21, 1942 and in reliance thereon, entered into an agreement with Mount Vernon Car Manufacturing Company and J. P. Devine Manufacturing Company, Inc., for delivery and sale to them of natural gas at their plants in Mount Vernon, Illinois, to the extent of the entire fuel requirements of said companies.

The complaint further alleged that, as contemplated in the agreement of July 21, 1942, plaintiff constructed and put into operation a pipe line for the purpose of supplying said car companies at a cost of approximately $120,000 and thereafter purchased and constructed other pipe lines and equipment at a cost of approximately $50,000 and incurred great additional expense to procure and arrange to serve plaintiff's customers; that the plaintiff has procured and is now serving several industrial consumers in addition to the car companies and has been requested by numerous other industrial consumers to supply them with natural gas; that its present customers require a daily delivery in excess of 3,500,000 cubic feet of natural gas and that plaintiff has a potential market of another 2,500,000 cubic feet of natural gas per day; that since Novem-

ber 3, 1943 defendant has never furnished plaintiff more than 2,500,000 cubic feet on any one day and since that date the quantities of natural gas furnished have constantly decreased until plaintiff at the time of filing the complaint, was furnishing to its customers less than an average of 750,000 cubic feet per day; and that at least since November 3, 1943 defendants failed to deliver to plaintiff the quantities of natural gas to which the plaintiff is entitled pursuant to the provisions of the agreement of July 21, 1942; that plaintiff made numerous demands to defendants to supply the gas required by said agreement of July 21, 1942 but that defendants have failed and refused to do so; that plaintiff has, at all times, been ready and willing to accept delivery of and pay for all natural gas required to supply the demands of plaintiff's customers.

It is further alleged that because of the breach by the defendants of said agreement of July 21, 1942, plaintiff has been unable to supply even the minimum requirements of its present customers; that as a result, plaintiff has irretrievably lost some of its actual market and is continuing to lose more and that its business is being rapidly destroyed, and will be completely destroyed unless the defendants be required to perform and carry out their obligation under said agreement of July 21, 1942; that apart from the loss of plaintiff's investment, if said agreement is not substantially performed, the actual losses previously suffered and which may hereafter be suffered, and in addition thereto, the loss of profits previously suffered and which may hereafter be suffered, on the quantities of natural gas which plaintiff could have sold and could hereafter sell throughout the term of the agreement of July 21, 1942 if such quantities should be available, would constitute the major part of plaintiff's damages; that plaintiff has at all times performed, is now performing, is ready, willing and

able to continue to perform its part of the agreement of July 21, 1942.

The complainant's prayer for relief, among other things, asks that defendants or one or more of them be required to specifically perform all of the terms of said agreement of July 21, 1942; that defendant be required to account to plaintiff for losses and damages plaintiff has sustained and will sustain throughout the term of said agreement of July 21, 1942 whether or not said agreement shall be specifically enforced; that the plaintiff have judgment against the defendants for all losses and damages which the plaintiff has heretofore or will hereafter sustain on account of the failures and defaults of the defendants and that the plaintiff have such further and general relief as equity will require.

The answer of the defendant sets up as defenses to the complaint, that it is not under any obligation by virtue of said agreement of July 21, 1942 or supplements thereto, to deliver to plaintiff any natural gas except such residue gas as the defendant has available for sale in accordance with the written contract which it has with the producers of casinghead gas; that under and by virtue of said agreement, it was not obliged to deliver to plaintiff any natural gas in excess of the amount of residue gas available for sale by it in accordance with the provisions of the casinghead gas contracts under which it acquired the casinghead gas, from which said residue gas was left; that at the time of entering into the said agreement of July 21, 1942, the defendants had available for sale to plaintiff, residue gas in excess of 5,000,000 cubic feet per day and had the same available until the Fall of 1943; that since July 21, 1942 there has been a steady depletion of the casinghead gas available in the Salem, Illinois field through conditions over which the defendant had no control; that with the decline in the production of

oil and casinghead gas the operators and owners of wells, who are the sellers under the casinghead gas contracts, have been demanding back the full amount of residue gas to which they are entitled for the development and operation of their leases under the provisions of the casinghead gas contracts; that this has reduced the volume of residue gas which defendant has for sale to plaintiff, which at the time of the filing of the answer, was approximately 250,000 cubic feet per day; which said residue gas was all that the defendant can procure for delivery to plaintiff; that there is no other source of natural gas in the Salem, Illinois field from which the defendant could procure gas to sell to the plaintiff; that the depletion of the casinghead gas available in the Salem, Illinois field caused the shut-down by the defendant of its plant designated as Sunflower No. 1 and that the depletion now threatens the shut-down of Sunflower Plant No. 2 and the complete cessation of all operations of defendant in the Salem, Illinois field; that the provision of said agreement of July 21, 1942 calling for the furnishing of 5,000,000 cubic feet per day is not binding upon the defendant in case of a depletion in the Salem, Illinois field, arising out of causes beyond the control of the defendant; that the defendant is fulfilling all of its obligations to the plaintiff under the provisions of said agreement of July 21, 1942 for the reason that section 18 of said agreement expressly provides that the defendants should not be liable for failure to furnish gas pursuant to the provisions of said contract where said failure arises because of the depletion of said gas supply and that the failure of the defendant to furnish more gas than is now being furnished is due entirely to the depletion of the supply available and to causes beyond its control; and that said agreement is lacking in mutuality.

The plaintiff by its reply filed April 24, 1944, takes issue with the matters of defenses put forward by the **defendants.**

The First National Bank of Philadelphia as trustee, on October 30, 1944 filed its intervening petition claiming first lien upon the proceeds of any recovery by the plaintiff to the extent of the principal and interest on all outstanding bonds and any other amounts due by virtue of an indenture of mortgage and deed of trust to it to secure the payment of moneys due from the plaintiff. A like petition was filed on October 30, 1944 by Alexander B. Bassett, et al., who were the owners of the bonds secured by said indenture of mortgage and deed of trust. The decree of the circuit court established the lien. This portion of the decree is in no way questioned here and, therefore, no further reference will be made to this feature.

The agreement of July 21, 1942 after various recitals by way of "whereases," by section 1, fixed the duration of the agreement to September 1, 1947 as its "primary term" and section 2, required the plaintiff to enter into an agreement for the sale of natural gas to Mount Vernon Car Manufacturing Company and J. P. Devine Manufacturing Company, Inc., to the extent of the entire fuel requirements of their respective plants located at Mount Vernon, Illinois. Section 3, required plaintiff to construct and put into operation at its expense, a natural gas pipe line to extend from what is termed the main delivery point to a point at or near the plant of the Mount Vernon Car Manufacturing Company. Section 4 provides for the termination of the agreement for failure of plaintiff to comply with sections 2 and 3. Section 5 fixed the delivery points. Section 6, provides for the defendants to make the necessary connection with plaintiff's pipe line.

Section 7 provides in part as follows: "QUANTITY. Upon the completion of, and connection of and with, Buyer's said pipe line, as aforesaid, and thereafter throughout the term of this agreement, Sellers jointly and severally covenant and agree to sell, or to cause to be sold, to Buyer, and Buyer covenants and agrees

to purchase from Sellers, or either of them, at the prices hereinafter specified, all of the natural gas which may be necessary to enable Buyer, from time to time, to supply said total gas requirements of Mount Vernon Car Manufacturing Company and J. P. Devine Manufacturing Company, Inc., under the Car Company Contract, and any and all renewals and extensions thereof, and the total gas requirements of all such other customers as Buyer may now have or may hereafter procure. . . . In order that Sellers, or one of them, directly or indirectly, may at all times be in a position, so far as possible, to deliver to Buyer sufficient gas to supply the said total requirements of Mount Vernon Car Manufacturing Company and J. P. Devine Manufacturing Company, Inc., under the Car Company Contract and the total requirements of all of Buyer's said other customers, Sellers jointly and severally expressly covenant and agree that, at all times throughout the term of this agreement, Sellers will respectively give to Buyer, and do hereby respectively give to Buyer, the first call upon, and exclusive right to purchase, all natural gas which Sellers, or either of them, or any affiliate owned or controlled, directly or indirectly, by Sellers, or either of them, shall respectively have available for delivery in and from the said Salem oil field and vicinity, not only from Sunflower No. 1 Plant and Sunflower No. 2 Plant, but also from any other plant owned or controlled, directly or indirectly, by Sellers, or either of them, or any such affiliate, and from any oil well, casinghead gas well, or natural gas well, owned or controlled, directly or indirectly, by Sellers, or either of them, or any such affiliate. Sellers further jointly and severally covenant and agree, anything hereinbefore contained to the contrary notwithstanding, that Sellers, or one of them, will, on each and every day throughout the Primary Term of this agreement have available for delivery at the Main Delivery Point and will de-

liver to Buyer thereat, if required by Buyer, a minimum of 5,000,000 cubic feet of natural gas."

Section 8 provides as follows: "SELLERS' CONTRACTS FOR SUPPLY OF CASINGHEAD OR OIL GAS. Sellers jointly and severally covenant and agree to use their respective best efforts to keep in force throughout the entire term of this agreement all of the respective agreements of Sellers, or either of them, or of any such affiliate, for the delivery of casinghead or oil gas to Sunflower No. 1 Plant, Sunflower No. 2 Plant, and to each and every other plant owned or controlled, directly or indirectly, by Sellers, or either of them, or any such affiliate, at which natural gas may now or hereafter be or become available, and to make, and to cause to be made, all such other agreements or arrangements for additional deliveries thereof, and to do, or cause to be done, all such other things, as may be necessary to enable Sellers, or one of them, or one or more of such affiliates, from time to time, to deliver to Buyer such quantities of natural gas as shall be sufficient to enable Buyer at all times to supply the said total requirements of Mount Vernon Car Manufacturing Company and J. P. Devine Manufacturing Company, Inc. under the Car Company Contract and the total requirements of all of Buyer's said other customers."

Section 9 provides for the maintenance and operation of plaintiff's pipe line. Section 10 provides for the erection of measuring stations. Section 11 provides for delivery pressure to be maintained by the defendants. Section 12 provides for measuring instruments and measurement of gas in British Thermal Units. Section 13 provides for the reading of meters. Section 14 provides as follows: "PRICE. The number of cubic feet of natural gas which shall have been delivered hereunder in each calendar month, and the pertinent number of Therms when applicable, shall be determined in accordance with the provisions of

Section 12 hereof from the readings of Buyer's meter or meters and instrument or instruments at the measuring stations, and the prices to be paid by Buyer to Sellers for all gas delivered hereunder shall be as follows:

(a) for all gas measured at the Main Measuring Station, sixty-five hundredths cents per Therm;

(b) for all other gas, if any, delivered hereunder, one-half (½) of the average resale price received by Buyer therefor.''

Section 15 provides for billing and payment. Section 16 provides for the testing of meters and adjustment of accounts. Section 17 provides for the merchantability of the gas.

Section 18 provides as follows: ''INTERRUPTIONS. Buyer covenants and agrees to complete and put into operation its pipe line, pursuant to the provisions of Section 3 hereof, and thereafter to keep itself in a position to accept deliveries of gas hereunder, and Sellers jointly and severally covenant and agree to make the installations and connections provided for in Section 6, and at all times to respectively keep themselves, and to cause any such affiliate to keep itself, in a position to furnish natural gas to Buyer each day, to the extent and as hereinbefore provided; but neither Buyer nor Sellers nor any such affiliate shall be held liable for damages, nor shall this agreement be subject to termination because or on account of delays or interruptions, or because of inability to complete and put into operation said pipe line, installations or connections, or because of depletion of gas supply except as herein otherwise provided, if such delays or interruptions, or such inabilities, as the case may be, shall be due to Acts of God, strikes, riots, epidemics, landslides, lightning, earthquakes, fires, storms, floods, washouts, arrests and restraints of rulers and peoples, civil disturbances, governmental embargoes or prohibitions, priorities on or shortage

of necessary materials, explosions, breakage or acci-
dent to lines of pipe, installations, connections, or
equipment, freezing of lines of pipe, or any other
cause, whether of the kind herein enumerated or other-
wise, not within the control of Buyer or Sellers or
any such affiliate, or if such depletion shall occur, as
the case may be; provided that any such cause for
any such delay or interruption or inability or deple-
tion shall, so far as possible, be remedied with all
reasonable dispatch.''

Section 19 provides for the apportionment of taxes.
The last four sections, numbers 20, 21, 22 and 23, pro-
vide for liability for damage, warranty, ownership of
physical property and assignment of the contract.

At the time of the entering into the agreement of
July 21, 1942, Sunflower Natural Gasoline Company
owned an oil absorption gasoline plant in the Salem,
Illinois oil field called Sunflower Plant No. 1. Defend-
ant, Sunflower Gasoline Corporation, owned a similar
plant in the same field called Sunflower Plant No. 2.
At the same time, the Illinois-St. Louis Gas Line Com-
pany, an affiliate of these two defendants, owned a
pipe line system connecting Sunflower Plant No. 1
with the City of Centralia, Illinois, which was subse-
quently changed to connect with Sunflower Plant No. 2.
The Salem field was primarily a producer of oil.
There were numerous oil and gas fields in the area in
which what is termed casinghead gas was being dis-
covered and being produced in large quantities. There
were also natural gas wells in the vicinity. Casinghead
gas is that which was expelled at the oil wells from
the earth, and in the Salem field great quantities were
expelled. Companies including the defendants were
engaged in extracting liquids from this casinghead gas
by means of absorption and compression plants oper-
ated for this purpose. These liquids were valuable
and consisted of gasoline, butane, propane, iso-pentane
and iso-butane. After the gasoline and other liquids

are extracted from casinghead gas, the remaining gas, called residue gas, is relatively free of liquid and still rich in heat producing constituents.

Defendants, the Sunflower companies, never owned any oil leases or operated any oil wells and they depended for their supply of casinghead gas upon producers of oil. They had entered into contracts for this casinghead gas with lessees and operators of oil wells. The contracts in the main were in standard form. Nearly all were cancellable at the option of the oil producer and all were terminable by the seller of the casinghead gas if it determined the requirements of oil production necessitated either a return of all the residue gas or the use of casinghead gas for the purpose of the wells. The result of this was that in actuality, the defendants were dependent upon the oil well operators for the amount of residue gas that they might have for delivery to the plaintiff.

At the time of the entering into the agreement of July 21, 1942, the defendants had contracts with oil operators for the furnishing of casinghead gas which gave them a supply of residue gas which was more than sufficient, after meeting the demands of their sellers, to meet the requirements of the agreement of July 21, 1942 for natural gas; and from this source, the terms of the agreement were complied with until about November 1943. Beginning in November 1943, and at all times afterwards, the defendants failed to furnish gas sufficient for the requirements of the plaintiff's customers. The daily deliveries decreased from 1,952,700 cubic feet in November 1943 to 327,100 cubic feet in May 1944 and at the time of the trial, and after June 18, 1944, the defendants had no residue gas for sale and did not anticipate that they would have any in the future. The defendants thus became unable to furnish the requirements of the plaintiff for natural gas, because the oil operators upon whom they depended for casinghead gas, after the extraction process

of residue gas, either by cancellation of their contracts or by exercising their options under the contracts, required to be delivered back to them larger quantities, from time to time, of the residue gas for their own use either in the operation of their leases or for repressuring purposes. Repressuring consists of injecting gas into the earth for the purpose of increasing the production of oil from the wells.

After the making of the agreement of July 21, 1942, there began a reduction in the production of oil in the Salem field, and the sellers of casinghead gas, from time to time, demanded a larger return of residue gas from the defendants, which was being used by them for their own operations including the repressuring of oil wells.

It is apparent from the record that the failure of the defendants to supply the requirements for natural gas to the plaintiff, was due to the fact that they depended entirely upon residue gas available under their contracts for casinghead gas with the oil operators, and that they were unable to so comply with said agreement because of the cancellation of contracts, exercise of options and increased demands of the oil operators under their contracts with the defendants.

We come then immediately to a consideration of the question as to whether under the terms of the agreement of July 21, 1942, the defendants were excused from furnishing gas to the plaintiff by reason of what they term "depletion" not within their control.

In support of this position, the defendants rely on that part of section 18 in the agreement of July 21, 1942, which provides that neither buyer nor sellers shall be liable for damages because of the depletion of the gas supply not within the control of buyer or sellers.

The agreement, like any other contract, must be construed as an entirety (*MacAndrews & Forbes Co. v. Mechanical Mfg. Co.*, 367 Ill. 288; *Llewellyn v.*

*Board of Education, Cicero-Stickney High School Tp. Dist.,* 324 Ill. 254) and enforced according to its terms, and if it is unambiguous, clear, definite and certain, there is no room for construction by the court. (*Domeyer v. O'Connell,* 364 Ill. 467; *Decatur Lumber & Manufacturing Co. v. Crail,* 350 Ill. 319; *Green v. Ashland Sixty-Third State Bank,* 346 Ill. 174.) The law is well settled that when one by his own contract engages unconditionally to do an act or to make deliveries, he takes the risk of being unable to perform, although his inability is caused, except where it is rendered impossible by an Act of God or the public enemy, by reasons beyond his control inasmuch as he might have provided against such contingencies by his contract. (*Bunn v. Prather,* 21 Ill. 217; *Bacon v. Cobb,* 45 Ill. 47; *Dehler v. Held,* 50 Ill. 491; *Deibler v. Bernard Bros., Inc.,* 385 Ill. 610.)

As to the effect to be given to the provisions of section 18 which relieves the parties from damages on account of depletion of gas supply, the same is limited by the clause "except as herein otherwise provided," which clause can refer only to the entire contract inasmuch as there is not anything in section 18 limiting the operation of the words to such section.

We must, therefore, turn to the other provisions of the contract to ascertain which provisions were excepted. By the specific terms of section 7 of the contract the defendants covenant and agree to sell to the plaintiff, all of the natural gas which may be necessary to enable the plaintiff, from time to time, to supply the total gas requirements of Mount Vernon Car Manufacturing Company and J. P. Devine Manufacturing Company, Inc., under the car company contract, and any and all renewals and extensions thereof, and the total gas requirements of all such other customers as plaintiff might then have or might thereafter procure. It was also provided in this section that the defendants would on each and every day throughout the primary

term of the agreement which extends up through September 1, 1947, have available for delivery at the main delivery point and would deliver to the plaintiff thereat, if required by the plaintiff, a minimum of 5,000,000 cubic feet of natural gas. It is thus apparent from these provisions that the defendants covenant and agree to furnish to the plaintiff a minimum of 5,000,000 cubic feet of natural gas per day. These were the exceptions referred to in section 18 of the contract and constituted direct covenants and agreements apart from the provisions of section 18.

■ ■ Moreover, the failure to deliver gas to the plaintiff by the defendants was not due to depletion. Depletion as applied to gas and oil is the reduction in the mineral contents of the reserves from which the product is taken (*United States v. Ludey*, 274 U. S. 295, 47 S. Ct. 608, 71 L. Ed. 1054). The record shows that there had been some reduction in the production of oil and the emitting of casinghead gas in the Salem, Illinois field. There was ample casinghead gas, however, to have readily supplied the demands of plaintiff under the agreement of July 21, 1942 from residue gas. The difficulty arose from the fact that the defendants relied on residue gas to comply with the agreement of July 21, 1942 and in turn depended upon their contracts with oil companies to secure casinghead gas from which the residue gas was obtained. As time passed, these contracts were either cancelled under their terms or the defendants were compelled to return the residue gas to such companies. If the defendants wished to avoid liability because of these conditions, they should have provided against them by the provisions of the agreement with the plaintiff.

■ Among other errors assigned by the defendants is that the agreement in question lacks mutuality. It is, of course, a well understood law that a contract not based on any other consideration, must contain mutuality of obligation. However, it is not the law

that a contract must be reciprocal as to each and every separate obligation. It is sufficient if the contract legally obligates both parties to abide by and perform its conditions. (*Prudential Ins. Co. v. Hite,* 69 Ill. App. 416.) By the provisions of section 2 of the agreement of July 21, 1942, the plaintiff was required within fifteen days from the date of the execution of said agreement, to enter into an agreement for the sale of natural gas to Mount Vernon Car Manufacturing Company and J. P. Devine Manufacturing Company, Inc., to the extent of the entire fuel requirements of their respective plants. In pursuance of this agreement, the plaintiff did enter into such agreement under date of July 21, 1942 by the terms whereof, among other things, said companies agreed to purchase from the plaintiff for a period of five years, all of their natural gas to the extent of their entire fuel requirements and pay, therefor, as stated in the contract, a minimum of $30,000 per year. By this agreement as well as by section 3 of the agreement of July 21, 1942 between the plaintiff and defendants, plaintiff was required to complete and put into operation a natural gas pipe line approximately twenty miles in length to extend from what is termed the main delivery point to the plants of the said companies at Mount Vernon, Illinois. In pursuance of these agreements, the plaintiff did construct such pipe line at a cost of $120,000. As a part of the transaction which resulted in the said agreement of July 21, 1942 between plaintiff and defendants, and by agreement of the same date between the plaintiff and the Illinois-St. Louis Gas Line Company, plaintiff acquired approximately ten miles of pipe line system owned by the Illinois-St. Louis Gas Line Company, an affiliate of the defendants, extending from Sunflower No. 1 Plant at or near Salem, to a point at or near the City of Centralia, Illinois, at a cost of $40,000 and took over the furnishing of gas to

the customers previously served by the Illinois-St. Louis Gas Line Company. By the terms of said agreement of July 21, 1942 between the plaintiff and defendants, the defendants covenant and agree to sell or cause to be sold to the plaintiff and the plaintiff covenants and agrees to purchase from the defendants at the price specified in the agreement, all of the natural gas which may be necessary to enable the plaintiff, from time to time, to supply the total gas requirements of Mount Vernon Car Manufacturing Company and J. P. Devine Manufacturing Company, Inc., and the total gas requirements of all such other customers as the plaintiff may have. Other reciprocal covenants could be pointed out.

It appears clear, therefore, that said agreement of July 21, 1942 between the plaintiff and defendants is mutual and based on adequate considerations.

The defendants contend said agreement of July 21, 1942 between the plaintiff and defendants is in certain respects uncertain, which alleged uncertainties vitiate the contract. Defenses other than those which go to the jurisdiction of the court not raised in the trial court will not be considered on review. (*Bittner v. Field,* 354 Ill. 215, 220; *Hill v. Siffermann,* 230 Ill. 19, 25; *Chicago Title & Trust Co. v. DeLasaux,* 336 Ill. 522, 529.) The alleged defenses of uncertainty were not raised in the answer of the defendants or in any other way in the trial court. They will not, therefore, be considered for the first time by the court here.

The trial court found in its decree as facts that all material allegations of the complaint had been proven and that the plaintiff would be entitled to specific performance of the agreement of July 21, 1942 between the plaintiff and defendants, but that as a result of defendants' failures it had become impossible for defendants to comply with the terms of said contract, so that it would be futile to decree a specific

performance of said contract as the same was not at the time of the decree susceptible to specific performance and that, therefore, the prayer for mandatory injunction would not be granted. This decree found further that the contract having been violated by the defendants, the plaintiff was entitled to recover as an alternative relief, damages as prayed for in the complaint. It seems clear that what the court meant was that by reason of the failures of the defendants, there was no practical way that a court of equity could enforce the performance of the contract in question and in that sense, the enforcement of the contract was impossible. The defendants assign as error that the court after denying the equitable relief, then proceeded to assess damages. The rule is as stated by the defendants, that under the law in Illinois, a court of equity will not ordinarily, after the denial of equitable relief, go on and adjudicate the question of damages. (*Patterson v. Patterson,* 251 Ill. 153; *Brauer v. Laughlin,* 235 Ill. 265.) Seeming exceptions exist, however, where equitable considerations require the court to go on and adjudicate damages. (*Garden City Sand Co. v. Southern Fire Brick & Clay Co.,* 260 Ill. 231.) As to whether in the instant case such equitable considerations exist is unnecessary for us to decide because of the view we take.

Early in the trial of the case the defendants took the position that it was in reality a case for damages. The complaint sought and prayed for damages either in addition to specific performance or as an alternative to specific performance. No objection was made by any motion filed directed to the pleadings, nor was the right of the court to award damages either as an incident or an alternative, in any way questioned by the pleadings. Moreover, both sides tried the case before the court below affirmatively and without any objection or question on the theory that there was being adjudicated by the court the question of damages

either in addition to specific performance or as an alternative to specific performance.

■ ■ The law is well settled that, barring a question which goes to the jurisdiction of the court, parties cannot try a case on one theory in the trial court and then on appeal assign as error the procedure of the court which they had been a part of producing. Not having in any way raised the question of the power of the court to adjudicate the damages there, the same cannot be questioned here for the first time. (*Bittner v. Field,* 354 Ill. 215, 220; *Hill v. Siffermann,* 230 Ill. 19, 25; *Kaufman v. Wiener,* 169 Ill. 596; *Monson v. Bragdon,* 159 Ill. 61; *Stout v. Cook,* 41 Ill. 447; *Johnson v. Miller,* 50 Ill. App. 60.)

■ Defendants assign as error that the damages of $200,000 are excessive. The court below in arriving at its conclusion did so on the basis of loss of profits to the plaintiff, past and future. These damages were specifically claimed in the complaint and in its prayer for relief. Being an action in equity, the damages were properly assessed to the date of the entry of the decree. (*Baker v. Salzenstein,* 314 Ill. 226; *Town of Kaneville v. Meredith,* 361 Ill. 556; *Kelly v. Galbraith,* 186 Ill. 593.)

■ Early in the trial of the case, if not before, the defendants completely repudiated the agreement in question of July 21, 1942. Under such circumstances, the plaintiff had a right to treat the repudiation as putting an end to the contract for all purposes of performance and recover the profits it would have realized if it had not been prevented from performing, continuing the contract in force for the latter purpose only. (*Lake Shore & M. S. R. Co. v. Richards,* 152 Ill. 59.)

■ ■ Previous to the filing of the complaint, the defendants had for a substantial period, breached the terms of the contract. Where property or goods are purchased for resale, as here, loss of profits is a

proper measure of damages. (*Thorne v. McVeagh,* 75 Ill. 81; *Lapp v. Illinois Watch Co.,* 104 Ill. App. 255.)

A recovery may be had for prospective profits where there are any criteria by which future profits may be estimated with reasonable certainty. All the law requires as to the amount of loss or damage in such cases, is that it be approximated by competent proof and that the evidence shall with a fair degree of probability, tend to establish a basis for the assessment of such damages. (*Barnett v. Caldwell Furniture Co.,* 277 Ill. 286.)

The evidence in the case here showed with reasonable certainty the loss of profits to the plaintiff, past and future, for the primary term of the contract and taking into account solely the definite and known customers of the plaintiff, such loss of profits, past and future, was well over $200,000.

We have laboriously examined the record and the briefs filed in this cause. The briefs filed by the appellants amount to 340 pages with an appendix of 16 pages. The briefs filed by the appellee amount to 321 pages. The abstract of the record with the supplemental abstract amount to 889 pages. These were prepared by learned and experienced counsel. We have given consideration to all of the assignments of error and to all the contentions of the appellants. It appears that the trial court rightly understood the questions of law involved in the cause and correctly applied them to the facts. All issues of fact involved have been determined by the trial court adversely to the appellants and his conclusions are supported by the record.

We find no reversible error in the record. The decree of the circuit court of Marion county is affirmed.

*Decree affirmed.*

CULBERTSON and SMITH, JJ., concur.