WILLIAM C. HAYES, SR., Plaintiff-Appellant, *v.* PREFERRED RISK MUTUAL INSURANCE COMPANY, Defendant-Appellee.

(No. 74-285;

Fifth District—May 15, 1975.

Cohn, Carr, Korein, Kunin and Brennan, of East St. Louis (Rex Carr, of counsel), for appellant.

Reed, Armstrong, Gorman & Coffey, of Edwardsville, for appellee.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Plaintiff appeals from a judgment of the trial court directing a verdict in favor of the defendant at the close of plaintiff's evidence in a case wherein plaintiff sought damages from defendant because of an alleged wrongful termination of an insurance agency contract by the defendant.

Hayes became Preferred Risk's agent in 1954 when he bought the contract rights of an individual who was then employed by the company as its agent. In 1956 he bought the rights of another of the company's agents for $4800. This second purchase gave Hayes the right to be paid commissions by the company out of renewal premiums which were paid to the company on policies that had been sold by Hayes's predecessor. Hayes also acquired the right to solicit new business for the company in the East St. Louis area. The agreement contained the following provisions relevant to termination of the contract:

"7. This Agency may be terminated by either party by giving the other party oral or written notice of its intention to do so, but such notice and consequent termination shall not be construed as fully discharging either party's financial obligations hereunder. Termination, as aforesaid, shall, however, cancel all authority granted the Agent hereunder. The respective financial obligations of the parties shall be discharged as speedily as possible after such termination.

8. In the event of termination by either party:

(a) It is agreed that all books of record, documents and sup-

plies of all kinds pertaining to the business of the company shall, upon demand, be surrendered and delivered by the Agent to any legal representative of the company. This shall include the Agent's records, use and control of all expirations and dailies and it is understood that these expirations and dailies shall not remain the property of the Agent, but shall be turned over to the Company.

(b) Ownership of the business written shall be in the Company and the Agent shall have no right, title or interest therein or in the renewals thereof except as hereinafter specified. It is agreed that the Agent will make no attempt or effort, either directly or indirectly, to induce policyholders to withdraw from the Company or to place their business elsewhere.

(c) The Agent's right to future commissions is hereby recognized as a 'limited property right'. This 'limited property right' shall be deemed to mean the following: The Agent may receive no further commissions himself or new or renewal business. He shall, however, have a specific right, title and interest in future commissions to the extent that he may transfer, dispose or sell this interest to some other person on such terms as he sees fit, subject to the approval by the Company as to the qualifications of the transferee. In the event the Agent is unable to procure a purchaser or otherwise satisfactorily effect a transfer, the Company may, at its option, purchase the Agent's 'limited property right' on the basis of 'one times' the renewal commissions payable on policies written during the 12 months preceding and in effect at time of cancellation. It is understood that this limited property right to sell his renewal commissions shall accrue to the Agent only if the total of his gross premium received and earned under the contract exceeds the sum of $1000 during the last 12 month period preceding termination."

Paragraph 6, section (b), of the agreement said:

(b) If the total of the gross premium received and earned under this contract during any twelve month period exceeds the sum of $5000 (Five Thousand Dollars) the renewal commission as specified in the above paragraph shall from a date approximately one month thereafter be 10% so long as the gross premium for any 12 month period remains in excess of $5000.00."

This agreement was the basis of the relationship between Hayes and Preferred Risk from the date of the execution on February 25, 1956, until the spring of 1971. During the years 1968 to 1971, Hayes's annual gross premiums averaged above $52,000—$52,959.69 in 1968, $54,496.23 in

1969, $58,488.20 in 1970, and $45,776.42 in 1971. "Gross premiums" is a figure composed of initial premiums paid on new policies sold by the agent during the year and renewal premiums paid during the year on policies sold by the agent in past years.

On April 1, 1971, Hayes received a letter from Preferred Risk telling him that his agency would be placed on suspension after April 1, and that his agency contract would be terminated on May 31, 1971. The letter revealed that being "placed on suspension" meant that no new business would be accepted from Hayes. Termination of the agency contract meant that Hayes would cease to receive commissions out of renewal premiums paid on policies sold by him.

On April 15, 1971, Hayes's customers began to receive letters from the company labeled "Notice of Policy Expiration." The letters stated that Hayes was no longer an agent of Preferred Risk, and that the company assumed that Hayes's customers would prefer to remain his customers rather than renew their policies with Preferred Risk. The letters ended with the words, "If you would rather renew your coverage with our company, please write directly to us, enclosing this letter, and we will process the renewal of your policy(s) immediately." The company sent 393 of these policy expiration letters to Hayes's customers between June, 1971, and January, 1973. All the customers renewed their policies with the company and paid it $35,501 in renewal premiums between June, 1971, and January, 1973.

The company paid Hayes the commissions it owed him for the months of April and May of 1971. On May 31, 1971, the agency relationship between Hayes and Prefered Risk came to an end. After that time, the company paid nothing more to Hayes.

The argument that plaintiff has made is that the defendant had a duty under Illinois common law (see *Martindell v. Lake Shore National Bank*, 15 Ill.2d 272, 154 N.E.2d 683; *Dasenbrock v. Interstate Restaurant Corp.*, 7 Ill.App.3d 295, 287 N.E.2d 151) to perform the agency contract in good faith. This obligation of good faith, plaintiff contends, required the defendant to give him a reasonable opportunity to sell the "limited property right" that was his by paragraph 8, section c, of the contract, as a result of his having earned over $1000 in gross premiums during the 12 months preceding termination, before the defendant could terminate plaintiff's status as its agent. The defendant has responded with the argument that the agency contract was terminable at will, and that Illinois law does not require a party to use good faith in terminating a contract that is terminable at will. The defendant relies on *Repsold v. New York Life Insurance Co.*, 216 F.2d 479 (7th Cir. 1954), a case in which the United States Court of Appeals for the 7th Circuit applied Illinois law.

In *Repsold* the agency contract that had existed between New York Life and the plaintiff Repsold provided that the contract could be terminated upon 30 days notice by either party. New York Life maintained for its agents a system of fringe benefits and retirement benefits known by the acronym of "Nylic." A Nylic agreement accompanied the agency contract between Repsold and New York Life if during 20 consecutive years in the company's employ he sold insurance of at least $50,000 per year. When Repsold was in his 14th consecutive year, the company abruptly terminated his agency contract. The Nylic agreement accompanying that contract stated that termination of the agent's contract "shall terminate all his rights and benefits under Nylic, and no further payments of any kind shall become due on account of Nylic." Repsold argued that New York Life had entered the agency contract and the Nylic agreement intending to terminate them before Repsold could acquire vested rights; that this was bad faith; that, because of this bad faith, New York Life should not be allowed to terminate Repsold's agency contract and Nylic agreement except for good cause, despite terms to the contrary in the contract and in the Nylic agreement. The court of appeals said that under Illinois law, the state of mind of a contracting party at the time he made contractual promises could not diminish his rights under the contract. Thus, New York Life was free to terminate at will Repsold's agency contract and Nylic agreement regardless of the existence of good cause for the termination.

The principal difference between *Repsold* and the present case is found in the different contractual terms that are involved in this case. The agreement in *Repsold* clearly provided that all the Nylic rights of an agent came to an end when his agency contract was ended. But the agency contract now under consideration states that an agent retains a limited property right when his contract is terminated. Preferred Risk attempts to minimize this difference by arguing in its brief that the limited property right "did not imply any rights in future renewals but merely gave Mr. Hayes an opportunity to find a third party who was satisfactory to the company and to receive a fee therefor." This analysis of Hayes's limited property right is contrary to paragraph 8, section c, of the contract. There the contract says that if the agent cannot find a suitable purchaser, the company itself may buy the agent's limited property right. If the agent's limited property right amounted only to "an opportunity to find a third party who was satisfactory to the company and to receive a fee therefor," what would the company be paying the agent for when he had not found a satisfactory purchaser? Even the name given to the agent's right, that is, "property right," suggests that it is something more substantial than a mere opportunity to perform a service

and to be paid; it is a thing, a res, which can be sold by the agent to a third party or to Preferred Risk. The difference between *Repsold* and this case is therefore not minimal as Preferred Risk argues; rather, the difference is great and causes *Repsold* to be irrelevant.

Defendant argues that the terms of the contract must control the rights and liabilities of the parties; than an unqualified and unilateral right of termination was in the contemplation of the parties and clearly outlined on the face of the instrument involved in this case; and that absent some type of ambiguity on the face of the instrument, it cannot be subjected to any implied promises or conditions. *Johnson v. Continental Illinois Bank & Trust Co.*, 88 Ill.App.2d 124, 232 N.E.2d 59; *Decatur Lumber & Manufacturing Co. v. Crail*, 350 Ill. 319, 183 N.E. 228.

■■ We agree with the defendant that the terms of the contract control the liabilities of the parties to the contract; however, we disagree with defendant as to the meaning of the contract. The complaint alleged that the termination of the agency contract was a breach of its express and implied terms. The contract itself, apart from any duty of the parties to act in good faith, embodies a promise by the company to allow Hayes a reasonable opportunity to find a buyer for his "limited property right." Midway through paragraph 8, section c, of the contract appears the clause, "In the event the Agent is unable to procure a purchaser or otherwise satisfactorily effect a transfer * * *," which deals with the agent's attempted disposition of his "limited property right." The clause speaks in terms of the agent being unable to find a purchaser; it does not speak in terms of the company's refusing to allow the agent to find a purchaser. That is, the words show that the parties intended for the plaintiff to have a fair chance to obtain a purchaser of his interest under the agency contract. This conclusion is reinforced by the language of paragraph 8, section b, of the contract, "Ownership of the business written shall be in the Company and the Agent shall have no right, title or interest therein or in the renewals thereof except as hereinafter specified." Reference to the "limited property right" of plaintiff under paragraph 8, section c, is made by use of the words "except as hereinafter specified." Since the entirety of the plaintiff's rights after termination of his contract is represented by his "limited property right," the contractual provisions creating that "limited property right" should be so interpreted as to make it meaningful. If the parties had not intended for the plaintiff's "limited property right" to be meaningful, they would not have said, "except as hereinafter specified"; the words, "the Agent shall have no right, title or interest therein," would have been enough. In order for Hayes's "limited property right" to be meaningful, he had to have a reasonable opportunity to sell it after the defendant told him that it no longer wanted him as its agent and before the company terminated his status as an agent. The defendant

therefore had to give plaintiff a reasonable time in which to look for a purchaser after the defendant had notified the plaintiff of its dissatisfaction with him. In this case the company notified Hayes on April 1, 1971, that he would not be allowed to solicit new business after April 15, 1971, and that his agency contract would be terminated on May 31, 1971. Whether the 2 months between April 1 and May 31 of 1971 were a reasonable time in which the plaintiff could have sought out prospective purchasers of his agency and presented them to the defendant with the entreaty that the defendant allow the agency to continue in their hands rather than his, would be a question for the jury.

■■ An additional promise was embodied in paragraph 8, section c, of the contract. This was a promise by the defendant to pay an amount determined by a formula for plaintiff's "limited property right" if the defendant decided to appropriate for itself the benefit of that "limited property right." The pertinent language includes a phrase that was quoted above:

> "In the event the Agent is unable to procure a purchaser or otherwise satisfactorily effect a transfer the Company may, at its option, purchase the Agent's 'limited property right' on the basis of 'one-times' the renewal commission payable on policies written during the 12 months preceding and in effect at time of cancellation."

This passage speaks of the defendant's option to purchase the plaintiff's "limited property right" and not of an option to pay for that "limited property right," if it pleases the defendant to do so, after the defendant has already appropriated the benefit of it. In other words, the option given to the defendant is to purchase—to pay for and then receive—the plaintiff's interest. It is not an option to pay or not to pay after having taken over the "limited property right." A construction to this effect would make the plaintiff's "limited property right" a nullity because it would not give him any rights which he could enforce against the other contracting party, that is, the defendant. As demonstrated above, the words found in paragraph 8, section b, of the contract, "except as hereinafter specified," show that the parties intended for the plaintiff's "limited property right" to be meaningful. This shows that the defendant must pay the plaintiff an amount determined by the formula provided in the contract if the defendant has appropriated for its own use plaintiff's "limited property right."

For the foregoing reasons the judgment of the trial court is reversed and this cause is remanded for trial.

Reversed and remanded with directions.

EBERSPACHER and CARTER, JJ., concur.